IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| **DAVID SLEIGHT**,<br><br>                Plaintiff,<br><br>v.<br><br>**CAROLYN W. COLVIN**,<br>Acting Commissioner of the Social Security Administration,<br><br>                Defendant. | **REPORT AND RECOMMENDATION**<br><br>Case No. 1:14-CV-00065-RJS-EJF<br><br>District Judge Robert J. Shelby<br><br>Magistrate Judge Evelyn J. Furse |

      Plaintiff David Sleight filed this action asking the Court[1] to reverse or remand the final agency decision denying his Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, *see* 42 U.S.C. §§ 401–434. The Administrative Law Judge ("ALJ") determined that Mr. Sleight did not qualify as disabled within the meaning of the Social Security Act. (Certified copy of the transcript of the entire record of the administrative proceedings relating to Mr. Sleight (hereafter "Tr. __") 22, ECF No. 19.) Having carefully considered the parties' memoranda and the complete record in this matter, the undersigned RECOMMENDS the Court AFFIRM the Commissioner's decision.[2]

## FACTUAL & PROCEDURAL HISTORY

      Mr. Sleight filed a DIB application on July 31, 2012, alleging a disability onset date of April 12, 2011. (Tr. 9.) The Social Security Administration (SSA) denied the application

---

[1] On July 2, 2014, District Judge Robert Shelby referred this case to the undersigned Magistrate Judge under 28 U.S.C. § 636(b)(1)(B). (ECF No. 4.)

[2] Pursuant to Civil Rule 7-1(f) of the Rules of Practice for the United States District Court for the District of Utah, the Court concludes it does not need oral argument and will determine the appeal on the basis of the written memoranda.

initially and upon reconsideration.  (*Id.*)  Mr. Sleight then requested a hearing.  (*Id.*)  An Administrative Law Judge held the hearing in Salt Lake City, Utah on November 5, 2013.  (*Id.*)  The ALJ issued a decision on February 21, 2014, finding Mr. Sleight not disabled.  (Tr. 22.)  Mr. Sleight filed a request for review by the Appeals Council, and the Appeals Counsel denied the request for review on March 27, 2014.  (Tr. 5, 1.)

## Medical History

Mr. Sleight, born on August 14, 1991, (tr. 21), filed for DIB on the basis of a combination of impairments including major depressive disorder, Post-Traumatic Stress Disorder ("PTSD"), and degenerative disorders of the spine, (tr. 9, 12).

*1.      Mr. Sleight's Physical Health*

On April 12, 2011, a car accident injured Mr. Sleight.  (Tr. 12.)  At the time, Mr. Sleight served in the Marine Corps.  (Tr. 11.)  The day after the accident, Mr. Sleight sought treatment from Kings Bay Family Practice, where his records reflect he "[d]eveloped bilateral knee pain right after the accident, [and] later in the day developed posterior cervical and [lower back pain]."  (Tr. 1355.)  A couple of days later, Mr. Sleight went to a chiropractor, Jon Shiels.  (Tr. 333.)  During the appointment, Mr. Shiels noted that Mr. Sleight had "tenderness and swelling in the tranverse [sic] process."  (*Id*.)  Mr. Sleight continued with regular chiropractic treatment through August 2011, when he stated his intention to meet with a neurosurgeon.  (Tr. 333–42.)

Mr. Sleight began physical therapy for his lower back pain at Kings Bay Physical Therapy under the direction of Adam D. Lutz, DPT, on June 21, 2011.  (Tr. 1237–1240.)  Dr. Lutz recorded that Mr. Sleight suffered from constant lower back pain, with increased pain from prolonged sitting or standing.  (Tr. 1238.)  He further noted that Mr. Sleight's "[p]osture was abnormal" and that he moves in a "slow, guarded" fashion with "obvious discomfort."  (Tr.

1239.) As of July 19, 2011, Dr. Lutz reported that Mr. Sleight's "pain is worse at this time than when previous[ly] treated . . . ." (Tr. 1167.) On July 27, 2011, Mr. Sleight reported that he had level eight out of ten back pain after treatment. (Tr. 1132.) Treatment continued multiple times each week, with pain levels after treatment varying between five and eight out of ten through May 1, 2012. (Tr. 461, 616, 635, 637, 661, 667, 691, 693, 712, 726, 733, 738, 750, 757, 761, 764, 778, 783, 785, 798, 803, 819, 884, 980, 1000, 1095, 1109, 1111, 1130, 1132, 1167.) Dr. Lutz tried different forms of treatments, including therapeutic exercise and neuromuscular re-education. (Tr. 761.)

In June 2011, Mr. Sleight had an MRI that showed a mild bulge at L4-L5 and L5-S1. (Tr. 1036-1038.) The MRI was "[n]egative for disc protrusion, vertebral fracture or spinal/foraminal narrowing." (Tr. 1037.)

In September 2011, Mr. Sleight consulted with Kai McGreevy, M.D., on a referral from the naval base for neck and back pain. (Tr. 426-29.) Dr. McGreevy changed Mr. Sleight's medication and prescribed a facet joint nerve block. (Tr. 429.) Mr. Sleight received the prescribed injections in September and October of 2011. (Tr. 423-426.) Mr. Sleight reported to Dr. McGreevy that he experienced eighty percent relief but a return of the pain one week later. (Tr. 420.) Dr. Lutz recorded that Mr. Sleight reported the injections provided a few hours of excellent pain relief, followed by two days of elevated pain. (Tr. 980.) Dr. McGreevy ordered more injections. (Tr. 422.) Mr. Sleight had those injections, without lasting success, and Dr. McGreevy ordered more along with facet joint nerve ablation through January 2012. (Tr. 392-417.)

On January 31, 2012, Mr. Sleight reported an inability to sit or stand continuously for more than fifteen to twenty minutes. (*Id.*) Dr. Lutz, Mr. Sleight's physical therapist, stated that

Mr. Sleight had "not demonstrated any progress towards goals of [physical therapy]." (Tr. 762.) Dr. Lutz opined that the "[s]ubjective report and objective findings [] significantly limit [Mr. Sleight's] ability to work at a normal, high-functioning level." (*Id.*) Throughout February and March 2012, Mr. Sleight received epidural steroid injections and began opioid pain killers with moderate relief. (Tr. 373-389.)

Dr. Lutz performed another evaluation of Mr. Sleight on May 1, 2012. (Tr. 616.) On this occasion, Dr. Lutz reported that Mr. Sleight did not appear well and exhibited pain when transitioning from standing or sitting. (*Id.*) Ultimately, Dr. Lutz recommended ceasing physical therapy as it failed to show "objective/subjective improvements recently." (Tr. 617.) William E. Guy, M.D., examined Mr. Sleight on May 4, 2012 because Mr. Sleight had complaints of lower back pain and approved stopping the physical therapy because it provided no improvement. (Tr. 614.) Dr. Guy released Mr. Sleight without any limitations. (*Id.*)

On June 11, 2012, Dr. McGreevy noted that Mr. Sleight's movement appeared "moderately restricted in all directions, [with] lumbar extension mildly restricted," as he had in the past. (Tr. 370, 374, 381, 428.) He assessed that Mr. Sleight had cervical spondylosis without myelopathy, lumbosacral spondylosis without myelopathy, and muscle spasms. (Tr. 370–71.) During that visit, Dr. McGreevy began a TENS unit trial. (Tr. 371.)

Dr. McGreevy's records note that after evaluation, Mr. Sleight did not qualify as a candidate for surgery. (Tr. 367.) As a result, Dr. McGreevy recommended a spinal cord stimulator. (*Id.*) Mr. Sleight's back pain and mobility improved after he received a trial implant of a spinal cord stimulator. (Tr. 359.) On August 6, 2012, Dr. McGreevy continued to assess chronic pain syndrome, lumbosacral spondylosis without myelopathy, as well as lumbosacral radiculitis. (Tr. 357-358.)

On October 30, 2013, Scott Werner, PA, evaluated Mr. Sleight regarding his back and neck pain for his Social Security claim. (Tr. 1883-84.) Mr. Werner noted that having treated Mr. Sleight for the last year, Mr. Sleight had severe pain that caused sleep disturbance, thoughts of suicide, pervasive loss of interest in almost all activities, decreased energy, and difficulty concentrating or thinking. (Tr. 1884.) Mr. Werner assessed the following limitations on a standard work day: can only work one hour per day; sit or stand fifteen to thirty minutes at a time; sit or stand one hour of a workday; lift five to ten pounds occasionally; no frequent lifting; and occasional bending and stooping. (*Id.*) Mr. Werner further found "[e]vidence of nerve root compression, characterized by a neuroanatomic distribution of pain, limitation of motion of the spine, atrophy with associated muscle weakness." (Tr. 1883.)

2.   *Mr. Sleight's Mental Health*

Shortly after the April 12, 2011 car accident, Mr. Sleight felt quite depressed and attempted suicide. (Tr. 312.) He admitted himself voluntarily to Saint Simons By-The-Sea on April 26, 2011. (*Id.*) Mr. Sleight underwent a psychiatric evaluation by William A. Kelley, D.O., from Saint Simons By-the-Sea. (Tr. 315.) Dr. Kelley noted that Mr. Sleight had a family history of mental health issues. (Tr. 316.) Dr. Kelley further noted that Mr. Sleight had chronic pain, marital problems, sexual addiction problems, and depression. (Tr. 317.) Dr. Kelley found the depression severe, noting "significant suicidal ideation with an attempt [on his own life] within the last month." (Tr. 317–18.) Mr. Sleight reported he had made a recent attempt at suicide using a gun. (Tr. 315.) Despite these issues, Dr. Kelley noted that Mr. Sleight presented as alert, oriented, dressed appropriately, and having above average intelligence. (Tr. 317.)

5

An April 27, 2011, rescreening of Mr. Sleight's ability to continue his assignment with the United States Marines noted that he did "[n]ot qualif[y] for assignment to nuclear weapons position by reason of suicidal with plan, major depression, anti-depressants." (Tr. 1458.)

Saint Simons By-the-Sea discharged Mr. Sleight on May 6, 2011. (Tr. 312.) The discharge summary notes that Mr. Sleight's global assessment of functioning (GAF) score had risen from twenty-five at the time of admittance to seventy-five at the time of release. (Tr. 312–14.) The summary further indicates that Mr. Sleight continued to feel pain in his back and have depression. (Tr. 314.)

From the date of the discharge, Mr. Sleight began seeking treatment from the Naval Hospital Jacksonville Mental Health Clinic. (Tr. 1328.) Peter K. True, M.D., evaluated Mr. Sleight noting that Mr. Sleight appeared motivated to participate actively in therapy, and opined that "Paxil should be able to take care of [Mr. Sleight's] depressive symptoms." (Tr. 1334–35.) Dr. True noted that Mr. Sleight would "require medication for an extended period of time." (Tr. 1339.) On May 10, 2011, Dr. True found Mr. Sleight generally well-appearing. (Tr. 1316.) However, by May 17, Mr. Sleight again had a moderately depressed mood. (Tr. 1310.) He continued to attend group therapy classes and other evaluations, though he reported feeling little improvement. (Tr. 1291, 1288, 1273, 1268, 1261, 1259.)

On June 18, 2012, Mr. Sleight's father-in-law committed suicide under threat of deportation. (Tr. 588.) The event marked an increase in his wife's distress level and an increase of Mr. Sleight's depressive symptoms. (*Id.*)

On August 29, 2012, Marc W. Eaton, Ph.D., performed a mental health evaluation on Mr. Sleight. (Tr. 433.) Dr. Eaton found Mr. Sleight's affect and mood markedly abnormal, recording that Mr. Sleight appeared "[d]epressed with hopelessness at times, and guilt." (*Id.*)

Dr. Eaton also noted Mr. Sleight had an abnormal thought processes and flow of mental activity. (*Id.*)  He further opined that Mr. Sleight had limited ability to understand, remember, and carry out simple instructions (tr. 434); make simple work-related decisions; get along with the public, supervisors, and coworkers; and deal with changes in workplace settings (tr. 435).  Ultimately, Dr. Eaton found Mr. Sleight's becoming functional under stress highly unlikely.  (*Id.*)

A few weeks after the mental health evaluation by Dr. Eaton, the Marine Corps discharged Mr. Sleight.  (Tr. 493-94.)  In his final meeting with Dr. True on September 18, 2012, Dr. True maintained that while Mr. Sleight suffered from depression, Mr. Sleight remained optimistic about the future.  (Tr. 485.)

On December 10, 2012, Mr. Sleight sought treatment for depression from David M. Stein, Ph.D., who noted Mr. Sleight "[c]ontinues to struggle with depression; doesn't feel that medication has helped in the past or is helping much now; has occasional suicidal [ideation]." (Tr. 1730.)  Dr. Stein recorded a similar mood a month later, on January 8, 2013.  (Tr. 1729.)

On February 28, 2013, Mr. Sleight underwent another psychological evaluation completed by Richard T. Grow, Ed.D. at the request of the Disability Determination Unit.  (Tr. 1682.)  Dr. Grow noted that Mr. Sleight suffered from major depression, resulting in "[p]roblems with both concentration and attention."  (Tr. 1689.)  Dr. Grow also noted that Mr. Sleight was trying to "cope with several significant psychiatric disorders" and assessed a GAF of fifty.  (Tr. 1689.)

From the fall of 2012 to the spring of 2013, Mr. Sleight sought psychological counseling from Gregory L. Mayer, Ph.D.  (Tr. 1708-1711.)  Dr. Mayer provided an evaluation for the SSA on June 4, 2013.  (*Id.*)  Mr. Sleight reported low motivation, feeling lonely, and feeling empty among other symptoms.  (Tr. 1708.)  Dr. Mayer found Mr. Sleight suffered for major depressive

7

affective disorder, with recurrent severe episodes.  (*See* tr. 1711 (noting Axis I: 296.33 among other diagnoses).)  Dr. Mayer provided an additional mental health evaluation for Mr. Sleight on October 31, 2013.  (Tr. 1886-88.)  Dr. Mayer assessed a GAF score of fifty-five at that time.  (Tr. 1886.)  Dr. Mayer opined that Mr. Sleight's difficulty maintaining concentration would affect five to ten percent of a typical workday.  (*Id*.)  He similarly found that attendance issues would cause Mr. Sleight to miss ten to fifteen percent of the workday, that interruptions and rest would waste ten percent more of the workday, and that attempting to adhere to basic standards of neatness and cleanliness would consume an additional five to ten percent of the workday.  (Tr. 1886-1887.)  While Dr. Mayer found no limitations on Mr. Sleight's intellectual capacities, Dr. Mayer ultimately opined that Mr. Sleight would have fifty percent of the efficiency of an average worker.  (Tr. 1888.)  Dr. Mayer concluded that Mr. Sleight could not obtain and retain full-time work in a competitive setting due to these mental limitations.  (*Id*.)

## STANDARD OF REVIEW

42 U.S.C. § 405(g) provides for judicial review of a final decision of the Commissioner of the SSA.  The Court reviews the Commissioner's decision to determine whether the record as a whole contains substantial evidence in support of the Commissioner's factual findings and whether the SSA applied the correct legal standards.  42 U.S.C. § 405(g); *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007).  The Commissioner's findings shall stand if supported by substantial evidence.  42 U.S.C. § 405(g).

Adequate, relevant evidence that a reasonable mind might accept to support a conclusion constitutes substantial evidence, and "[e]vidence is insubstantial if it is overwhelmingly

contradicted by other evidence." *O'Dell v. Shalala*, 44 F.3d 855, 858 (10th Cir. 1994).³ The standard "requires more than a scintilla, but less than a preponderance." *Lax*, 489 F.3d at 1084. "Evidence is not substantial if it is overwhelmed by other evidence—particularly certain types of evidence (e.g., that offered by treating physicians)—or if it really constitutes not evidence but mere conclusion." *Gossett v. Bowen*, 862 F.2d 802, 805 (10th Cir. 1988) (internal quotations marks and citations omitted). Moreover, "[a] finding of 'no substantial evidence' will be found only where there is a conspicuous absence of credible choices or no contrary medical evidence." *Trimiar v. Sullivan*, 966 F.2d 1326, 1329 (10th Cir. 1992) (internal quotation marks and citations omitted).

Although the reviewing court considers "whether the ALJ followed the specific rules of law that must be followed in weighing particular types of evidence in disability cases," the court "will not reweigh the evidence or substitute [its] judgment for the Commissioner's." *Lax,* 489 F.3d at 1084 (internal quotation marks and citations omitted). The court will "review only the *sufficiency* of the evidence." *Oldham v. Astrue,* 509 F.3d 1254, 1257 (10th Cir. 2007). The court does not have to accept the Commissioner's findings mechanically but "examine the record as a whole, including whatever in the record fairly detracts from the weight of the [Commissioner's] decision and, on that basis, determine if the substantiality of the evidence test has been met." *Glenn v. Shalala*, 21 F.3d 983, 984 (10th Cir. 1994) (internal quotation marks and citation omitted). "'The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence,'" and the court may not "displace the agenc[y's] choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de

---

³ Courts apply the same analysis in determining disability under Title II and Title XVI. See *House v. Astrue*, 500 F.3d 741, 742 n.2 (8th Cir. 2007).

novo.'" *Lax*, 489 F.3d at 1084 (*quoting Zoltanksi v. FAA*, 372 F.3d 1195, 1200 (10th Cir. 2004)).

In addition to a lack of substantial evidence, the Court may reverse where the Commission uses the wrong legal standards, or the Commissioner fails to demonstrate reliance on the correct legal standards. *See Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994); *Thompson v. Sullivan*; 987 F.2d 1482, 1487 (10th Cir. 1993); *Andrade v. Sec'y of Health & Human Servs.*, 985 F.2d 1045, 1047 (10th Cir. 1993).

## ANALYSIS

The Social Security Act ("Act") defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Moreover, the Act considers an individual disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

In determining whether a claimant qualifies as disabled within the meaning of the Act, the SSA employs a five-part sequential evaluation. *See* 20 C.F.R. § 404.1520; *Williams v. Bowen*, 844 F.2d 748, 750-53 (10th Cir. 1988); *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). The analysis evaluates whether:

(1) The claimant presently engages in substantial gainful activity;
(2) The claimant has a medically severe physical or mental impairment or impairments;
(3) The impairment is equivalent to one of the impairments listed in the appendix of the relevant disability regulation which preclude substantial gainful activity;
(4) The impairment prevents the claimant from performing his or her past work; and

    (5) The claimant possesses a residual functional capacity to perform other work in the national economy considering his or her age, education, and work experience.

*See* 20 C.F.R. § 404.1520. The claimant has the initial burden of establishing the disability in the first four steps. *Ray v. Bowen*, 865 F.2d 222, 224 (10th Cir. 1989). At step five, the burden shifts to the Commissioner to show that the claimant retains the ability to perform other work existing in the national economy. *Id.*

In this case, the ALJ applied the five-step sequential disability evaluation and made the following findings of fact and conclusions of law with respect to Mr. Sleight:

1. "[Mr. Sleight] last met the insured status requirements of the Social Security Act on June 30, 2013." (Tr. 11.)
2. "[Mr. Sleight] did not engage in substantial gainful activity during the period from his alleged onset date of April 12, 2011 through his date last insured of June 30, 2013 (20 CFR 404.1571 *et seq.*)." (*Id.*)
3. "[Mr. Sleight] has the following severe impairments: Major Depressive Disorder; Post Traumatic Stress Disorder (PTSD); and degenerative disorders of the spine (20 CFR 404.1520(c))." (Tr. 12.)
4. "Through the date last insured, [Mr. Sleight] did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526)." (*Id.*)
5. "[Mr. Sleight] had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except he can lift 20 pounds occasionally and 10 pounds frequently; he can stand and/or walk 6 hours per 8-hour workday and sitting is not limited in an 8-hour workday; he can occasionally climb ramps or stairs, but never ladders, ropes, or scaffolds; he can occasionally balance, stoop, kneel, crouch, or crawl; due to his affective and anxiety disorders his ability to understand, remember, and carry out instructions is not limited; due to reduced attention and concentration his ability to use judgment in making work-related decisions is limited to those decisions found in simple, routine work; he has the ability to respond appropriately to supervision, co-workers, and work situations with only occasional job contact with the general public; his ability to deal with changes in a routine work setting is not limited." (Tr. 13.)
6. "Through the date last insured, [Mr. Sleight] was unable to perform any past relevant work (20 CFR 404.1565)." (Tr. 21.)
7. "[Mr. Sleight] was born on August 14, 1991 and was 21 years old, which is defined as a younger individual age 18–49, on the date last insured (20 CFR 404.1563)." (*Id.*)
8. "[Mr. Sleight] has at least a high school education and is able to communicate in English (20 CFR 404.1564)." (*Id.*)
9. "Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that [Mr. Sleight]

   is 'not disabled,' whether or not [Mr. Sleight] has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2)." (*Id*.)
10. "Through the date last insured, considering [Mr. Sleight's] age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that [Mr. Sleight] could have performed (20 CFR 404.1569 and 404.1569(a))." (*Id*.)
11. "[Mr. Sleight] was not under a disability, as defined in the Social Security Act, at any time from April 12, 2011, the alleged onset date, through June 30, 2013, the date last insured (20 CFR 404.1520(g))." (Tr. 22.)

In short, the ALJ found that Mr. Sleight did not qualify as disabled under the Social Security Act. (Tr. 22.)

In support of his claim that this Court should reverse the Commissioner's decision, Mr. Sleight argues that substantial evidence does not support the ALJ's findings because: (1) the ALJ erred in rejecting Mr. Sleight's subjective complaints, (2) the ALJ improperly rejected the opinions of Mr. Sleight's treating and examining medical providers, and (3) the ALJ failed to consider the response of the vocational expert when a hypothetical included necessary additional limitations. (Opening Br. 14, 17, & 19, ECF No. 13.) The undersigned addresses each argument in turn, and RECOMMENDS the District Court AFFIRM the Commissioner's decision.

### I. Mr. Sleight's Subjective Complaints

Mr. Sleight argues the ALJ improperly rejected his subjective complaints. (Opening Br. 17, ECF No. 13.) He contends the ALJ failed to acknowledge all of the evidence supporting his subjective complaints. (*Id.* at 18.) The undersigned finds the ALJ's opinion supported by substantial evidence.

"'Credibility determinations are peculiarly the province of the finder of fact, and [a court] will not upset such determinations when supported by substantial evidence.'" *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995) (quoting *Diaz v. Sec'y of Health & Human Servs.*, 898 F.2d 774, 777 (10th Cir. 1990)). "However, '[f]indings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings.'"

12

*Id.* (quoting *Huston v. Bowen*, 838 F.2d 1125, 1133 (10th Cir. 1988)).  If objective medical evidence shows a medical impairment that produces pain, the ALJ must consider the claimant's assertions of severe pain and decide the extent to which the ALJ believes the claimant's assertions.  *Id.*  To make this inquiry, the ALJ should consider such factors as

> the levels of medication and their effectiveness, the extensiveness of the attempts (medical or nonmedical) to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, the motivation of and relationship between the claimant and other witnesses, and the consistency or compatibility of nonmedical testimony with objective medical evidence.

*Id.* (quoting *Hargis v. Sullivan*, 945 F.2d 1482, 1489 (10th Cir. 1991)).  But this analysis "does not require a formalistic factor-by-factor recitation of the evidence.  So long as the ALJ sets forth the specific evidence he relies on in evaluating the claimant's credibility, the dictates of *Kepler* are satisfied."  *Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000).

The ALJ found one could reasonably expect Mr. Sleight's medically determinable impairments to cause his alleged symptoms.  (Tr. 16.)  However, the ALJ found Mr. Sleight's statements about the intensity, persistence, and limiting effects of his symptoms lacked credibility.  (*Id.*)  The ALJ provided the following reasons for this finding.  (Tr. 17.)  The ALJ noted the inconsistencies in the story Mr. Sleight told about his attempted suicide.  (Tr. 16-17, 58-59, 319, 1194.)  The ALJ also noted that no objective evidence supported the claim that Mr. Sleight needed surgery to treat his back injury, including three MRI reports that show "no evidence of any significant spinal disease" and one MRI that only indicates a "small concentric disc bulge and small, superimposed right para-central disc protrusion contacts the bilateral descending S1 nerve roots in the sub-articular zones, slightly displacing the right descending S1 nerve root."  (Tr. 17, 56-57, 440, 1572, 1851.)  The most recent MRI report suggests only that Mr. Sleight "may benefit from physical therapy" and nothing about surgery.  (Tr. 17, 1880-81.)

Futhermore, after ten months of physical therapy, the therapist released Mr. Sleight without any limitations. (Tr. 17, 1496-1497.) The ALJ also found Mr. Sleight's complaints of balance problems undermined by his statements to doctors denying any balance issues. (Tr. 18, 357, 363, 366.) The ALJ indicated that the objective evidence fails to explain Mr. Sleight's claims of pain and alleged limitations and therefore calls into question his credibility because the MRI shows greater problems on the left, while Mr. Sleight had a positive straight leg raise on the right. (Tr. 18, 357, 1880-81.) The ALJ further considered Mr. Sleight's reports of mental limitations overstated in comparison to the records of his mental health providers and his ability to complete schooling after the alleged onset date. (Tr. 18-19, 36-38, 221, 1191, 1869, 1886-1888.)

Because the ALJ set forth reasons grounded in substantial evidence in the record, the undersigned RECOMMENDS the District Court find substantial evidence supports the ALJ's evaluation of Mr. Sleight's credibility.

## II. Evaluation of the Opinions of Treating and Examining Medical Providers

Mr. Sleight argues the ALJ improperly rejected the opinions of his treating and examining medical providers. (Opening Br. 15, ECF No. 13.) Specifically, Mr. Sleight argues the ALJ erred by failing to provide legitimate reasons for according little weight to the opinions of Mr. Scott Werner, Dr. Gregory Mayer, and Dr. Marc W. Eaton. (*Id*. at 15-17.)

An ALJ must evaluate every medical opinion. 20 C.F.R. § 404.1527(c). If the ALJ finds a treating physician's opinion "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [] not inconsistent with the other substantial evidence in [the] case record," the ALJ must give the opinion controlling weight. 20 C.F.R. § 404.1527(c)(2). When the ALJ does not give a treating physician's opinion controlling weight, the ALJ must consider certain factors. 20 C.F.R. § 404.1527(c) provides these factors:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

See *Watkins v. Barnhart*, 350 F.3d 1297, 1300–01 (10th Cir. 2003) (quoting *Drapeau v. Massanari,* 255 F.3d 1211, 1213 (10th Cir. 2001)). To reject a medical opinion, the ALJ must provide "'specific, legitimate reasons.'" *Drapeau,* 255 F.3d at 1213 (quoting *Miller v. Chater*, 99 F.3d 972, 976 (10th Cir. 1996)).

Yet the ALJ's decision need not discuss explicitly all of the factors for each of the medical opinions. *See Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007) (stating that a lack of discussion of each factor does not prevent the court from according the decision meaningful review). When considering medical opinion evidence, the ALJ must weigh and resolve evidentiary conflicts and inconsistencies. *See Richardson v. Perales*, 402 U.S. 389, 399 (1971) (reflecting the ALJ's duty to resolve conflicting medical evidence).

Here, the ALJ did not accord controlling weight to Mr. Sleight's treating medical providers' opinions. Instead, the ALJ's decision provided specific, legitimate reasons for granting "little weight" to Mr. Werner, Dr. Mayer, and Dr. Eaton's opinions. (Tr. 20.) The ALJ gave little weight to Mr. Werner's opinion because "the objective evidence does not support finding significant physical limitations, and I do not give great weight to the claimant's allegations of pain, which account for most of his physical limitations." (*Id.*) Prior to making the statement, the ALJ explicitly reviewed the medical records and the lack of support for the severe pain claims. (Tr. 17, 56-57, 440, 1572, 1851, 1880-81.)

The ALJ analyzed Dr. Mayer's opinions as follows:

> [Dr. Mayer] does not assess very significant mental limitations, and as discussed above, mixes the assessment of limitations with physical problems and pain, which account for many of his limitations. He opines that the claimant needs [a] moderate amount of rest periods due to mental problems, but I do not give weight to this suggestion in light of the claimant's ability to engage in his college program.

(Tr. 20 (citations omitted).) Earlier in the opinion the ALJ notes that Dr. Mayer assesses Mr. Sleight's prognosis for recovery from his affective disorder as good and goes into greater depth regarding Dr. Mayer's opinion, the lack of evidence to support the physical limitations, and the significance of Mr. Sleight's schooling. (Tr. 19, 1886-1888.)

The ALJ further states "[Dr. Eaton] opined that the claimant is unable to function under stress due to his mental limitations. This is inconsistent with the claimant's history of engaging in regular college classes and getting an associate's degree. I give this assessment little weight." (Tr. 20 (citations omitted).) As already noted, the ALJ explained the significance he attached to Mr. Sleight's schooling, and substantial evidence supports the ALJ's conclusion. (Tr. 19, 36-38, 221.)

Because the ALJ provided specific, legitimate reasons for the weights accorded to the various medical source opinions, supported by substantial record evidence, the undersigned RECOMMENDS the District Court find no error.

### III. Step Five

Finally, Mr. Sleight argues that the ALJ failed to satisfy his burden at step five of the sequential analysis because the ALJ failed to rely on a complete hypothetical posed to the vocational expert. (Opening Br. 19, ECF No. 13.)

At step five of the sequential evaluation process, the burden shifts to the Commissioner to demonstrate that, given the claimant's RFC, the claimant can perform other work existing in

16

significant numbers in the national economy. 20 C.F.R. § 404.1520(a)(4)(v); *Thompson v. Sullivan*, 987 F.2d 1482, 1487 (10th Cir. 1993). To meet this burden, the ALJ must prove, with substantial evidence, that the claimant can work at a level lower than his past relevant work on a daily basis. *Thompson,* 987 F.2d at 1491. The ALJ may not rely on the absence of evidence as substantial evidence as it "effectively shifts the burden back to the claimant." *Id.* The ALJ may determine that a sufficient number of jobs exist by relying on the testimony of a vocational expert, 20 C.F.R. § 404.1566(e), or by relying on the Medical Vocational Guidelines, 20 C.F.R. §§ 404.1566(d) and 404.1569, among other things.

Based on physical impairments, the ALJ must first determine the type of work the claimant has the Residual Functional Capacity ("RFC") to perform taking into consideration his age, education, and work experience. *Williams v. Bowen,* 844 F.2d 748, 751–52 (10th Cir. 1988). The Regulations define the types of work as sedentary, light, medium, heavy, or very heavy. 20 C.F.R. § 404.1567; *see also Williams*, 844 F.2d at 752. The ALJ often bases his conclusion on the Medical Vocational Guidelines or "grids". 20 C.F.R. § 404, Subpt. P, App. 2; *see Frey v. Bowen*, 816 F.2d 508, 512 (10th Cir. 1987). The Regulations define light work as:

> lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.

20 C.F.R. § 404.1567(b).

However, where nonexertional impairments such as pain and mental illness exist, "an ALJ may not rely conclusively on the grids unless he finds (1) that the claimant has no significant nonexertional impairment, (2) that the claimant can do the full range of work at some RFC level on a daily basis, and (3) that the claimant can perform most of the jobs in that RFC

level." *Thompson*, 987 F.2d at 1488. Accordingly, the distinction between nonexertional and exertional impairments has importance. The regulatory framework measures exertion "in terms of the strength requirements for such physical activities as walking, standing, lifting, carrying, pushing, pulling, reaching, and handling." *Huston v. Bowen*, 838 F.2d 1125, 1131 (10th Cir. 1988); *cf.* 20 C.F.R. § 404.1545(b). Whereas, a nonexertional impairment "is present whether or not a claimant is exerting himself or herself in activities that relate to the strength requirements of the grid's RFC ranges" such as relaxing or lying down. *Houston,* 838 F.2d at 1131.

Mr. Sleight argues that the ALJ erred at step five because the ALJ failed to consider the response of the vocational expert after Mr. Sleight's representative added limitations from Dr. Eaton and Dr. Mayer's opinions to the hypothetical. (Opening Br. 20, ECF No. 13.)

"'[T]estimony elicited by hypothetical questions that do not relate with precision all of a claimant's impairments cannot constitute substantial evidence to support the Secretary's decision.'" *Hargis v. Sullivan*, 945 F.2d 1482, 1492 (10th Cir. 1991) (quoting *Ekeland v. Bowen*, 899 F.2d 719, 722 (8th Cir. 1990)). However, the vocational expert's response to a hypothetical including impairments not found by the ALJ does not bind the ALJ. *Talley v. Sullivan*, 908 F.2d 585, 588 (10th Cir. 1990); *Gay v. Sullivan*, 986 F.2d 1336, 1341 (10th Cir. 1993) (finding ALJ need not adopt vocational expert testimony regarding unestablished and conclusive limitations). The hypothetical questions Mr. Sleight refers to do eliminate any possible employment. (Tr. 74-75.) However, the ALJ discounted the opinions Mr. Sleight based those hypotheticals on, and the undersigned recommends the Court uphold the ALJ's determination on weight. Therefore, the vocational expert testimony on those limitations does not bind the ALJ.

Here, the vocational expert testified in response to a hypothetical question that an individual—of the same age and with the same education, work experience, and RFC as Mr.

Sleight—could work as a housekeeping cleaner, mail clerk, and marker. (Tr. 71–72.) Because the hypothetical question included all of the limitations the ALJ included in his RFC, both nonexertional and exertional, the ALJ did not err in relying on this testimony. *See Qualls*, 206 F.3d at 1373 (finding no error when the ALJ relied upon a response to a hypothetical question to the vocational expert that included all the limitations the ALJ ultimately included in his RFC assessment).

Accordingly, the undersigned RECOMMENDS the District Court find the ALJ did not have to adopt the vocational expert's response to the revised hypothetical, which included limitations the ALJ did not find Mr. Sleight had.

## RECOMMENDATION

For the reasons set forth above, the undersigned RECOMMENDS the District Court AFFIRM the Commissioner's decision.

The Court will send copies of this Report and Recommendation to all parties, who are hereby notified of their right to object. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). The parties must file any objection to this Report and Recommendation within fourteen (14) days of service thereof. *Id.* Failure to object may constitute waiver of objections upon subsequent review.

DATED this January 12, 2016.

BY THE COURT:

Evelyn J. Furse
United States Magistrate Judge